IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


FAIR HOUSING RIGHTS CENTER IN  :
SOUTHEASTERN PENNSYLVANIA  :
              :  CIVIL ACTION
    v.          :
              :  NO. 16-4677
MORGAN PROPERTIES MANAGEMENT :
COMPANY, LLC, ET AL.      :


**MEMORANDUM**

**SURRICK, J.**                   **JUNE __29__, 2018**

   Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 53

(Filed Under Seal).)

## I.  BACKGROUND

   Plaintiff Fair Housing Rights Center in Southeastern Pennsylvania ("FHRC") has brought

claims against Defendants Morgan Properties Management Company ("MPMC") and affiliated

properties, arguing that MPMC's policy of refusing to permanently adjust the rental due date of

its apartments for SSDI recipients violates the Fair Housing Amendments Act ("FHAA"), 42

U.S.C. §§ 3601-3619.[1][2] FHRC argues that MPMC's policy violates the FHAA's "reasonable

---

   [1] The Fair Housing Amendments Act of 1988 amended the Fair Housing Act of 1968 to
extend protection to people with disabilities. Pub.L. No. 100-430, 102 Stat. 1619, *codified at* 42
U.S.C. § 3601, *et seq.*; *see, e.g.*, *Congdon v. Strine*, 854 F. Supp. 355, 359 (E.D. Pa. 1994)

   [2] FHRC has also brought similar claims under the Pennsylvania Human Relations Act
("PHRA"). The PHRA is to be interpreted "as identical to federal anti-discrimination laws
except where there is something specifically different in its language requiring that it be treated
differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) (citing *Fogleman v. Mercy
Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)). The relevant PHRA sections state that it is
unlawful (1) "for any person to [r]efuse to sell, lease, finance or otherwise to deny or withhold
any housing accommodation or commercial property from any person because of the . . .
disability of any person, prospective owner, occupant or user of such housing accommodation . .
. ." and (2) to "[r]efuse to make reasonable accommodations in rules, policies, practices or

accommodation" provision of 42 U.S.C. § 3604(f)(3)(B), and that the policy has a disparate impact on the disabled in violation of 42 U.S.C. § 3604(f)(1)(A).

## A.     Factual Background

It is this Court's duty to view all facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The following facts are undisputed or reflect Plaintiff's version of facts in the record.

FHRC is a non-profit agency that works to ensure that persons with disabilities are provided equal access to housing opportunities.  (Am. Compl. ¶ 13, ECF No. 2.)   MPMC manages over 35,000 rental units in approximately 130 complexes in 10 states, including three properties in the Philadelphia area:  Brookside Manor Apartments and Townhomes and Kingswood Apartments, which are owned by Defendant KBF Associates L.P., and Montgomery Woods Townhomes, which is owned by Defendant Montgomery Woods Owner LLC.  (*Id.* ¶¶ 1-2; Joint Stip. ¶ 1, ECF No. 21; Def. Mem. 5, ECF No. 54.)

In 2012, FHRC received a complaint from a disabled person ("the complainant") who lived at Brookside Manor.   (*Id.* ¶ 25; *see also* Pl. Resp. 3, ECF No. 59; Pl. Resp. Ex. 3.)  The complainant was unable to work because of his disability, and therefore relied on Social Security Disability Insurance (SSDI) to pay his rent.  (*Id.*)   Brookside Manor, without exception, required

services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a housing accommodation."  43 Pa. Stat. Ann. § 955(h)(1).  We will analyze them under the same standard as the FHAA.  There is no reason to treat them differently.  The relevant PHRA provisions do not contain language that requires this Court to analyze it separately from the FHA claim.  *See, e.g., Brillhart v. Sharp*, No. 07-1121, 2008 WL 2857713, at *8 n.5 (M.D. Pa. July 21, 2008) ("Because the PHRA provisions at issue contain no such language [to cause it to be treated differently], the Court will analyze the plaintiff's FHA and PHRA claims under the same standards and case law."); *Sipio v. Twp. of Springfield*, No. 94-6180, 1996 WL 479670, at *2 n.6 (E.D. Pa. Aug. 20, 1996) (analyzing the plaintiff's PHRA discrimination claims under the same standard as the FHA because "the relevant provisions of the PHRA mirror those of the FHA").

all tenants including the complainant to pay the rent on the first day of every month. (*Id.*) This was a problem for complainant because he did not receive his social security check until later in the month, after the rent was due. (*Id.*) Based on this complaint, FHRC opened an investigation into MPMC's business practices to determine if SSDI recipients were being refused what it considered to be a reasonable accommodation. (Pl. Resp. at 3.)

As part of its investigation, FHRC sent "testers" to four MPMC properties: Brookside Manor Apartments and Townhomes, Kingswood Apartments, Montgomery Woods Townhomes, and Towers of Windsor Park. (Pl. Resp. Ex.'s 11-14.) The testers' job was to contact the Defendants' employees at the respective properties and to inquire about MPMC's policies for adjusting monthly rental due dates for SSDI recipients. (*Id.*) Each tester was informed that it was MPMC policy to not make a permanent or indefinite adjustment to the day of the month on which rent is due, regardless of disability. (*Id.*) During this time period, MPMC required a 3-to-1 income to rent ratio for potential tenants at the Philadelphia-area properties tested. (Def. Mot. Ex. 6, Ans. to Interr. ¶ 16.)

Defendants do not dispute that it is MPMC's policy to not make permanent or indefinite changes to the day of the month on which rent is due, regardless of whether the reason for the request is dependence on SSDI income or any other disability. In fact, MPMC's General Counsel Michael Schechter and MPMC's Director of Operations Christine Beechan both testified that this is MPMC's policy. (Pl. Resp. Ex. 1, Beechan Tr. 30:9-15; Ex. 2, Schechter Tr. 71:14-25, 72:1-17.) Moreover, the parties have stipulated that this is in fact MPMC's stated policy. (Joint Stip., ¶¶ 2, 7, ECF No. 21.)

The evidence in this record primarily deals with the operating procedures of MPMC, both as stated and as applied at its properties.

The Property Managers at each MPMC property are the ones responsible for delinquent rent collection, and they are assisted in this task by their assistant property managers. (Pl. Resp. Ex. 9, McPherson Tr. 13:21-14:20.) Property Managers for MPMC are salaried employees, and they do not receive overtime pay. (Pl. Resp. Ex. 8, Borkowski Tr. 8 67:1-5.)

MPMC purports to use the same rent collection and enforcement policies at all of its properties, in accordance with its written operating procedure entitled "Delinquent Rent Collections Standard Morgan Properties Procedure," or "SSOP." (Pl. Resp. Ex. 6, SSOP.) At all MPMC properties, it is company policy for the rent to be due on the first of each month. (*Id.*; Joint Stip. ¶ 5.) Late fees are automatically imposed on tenants if they have not paid the full rent amount by the 5th of the month. (*Id.*) If a tenant has not paid the full rent by the 15th of the month, the Property Manager will file a complaint in court against the tenant for the delinquent balance. (*Id.*)

MPMC properties use a computer program called Yardi to keep track of rent collection. (*Id.*) Yardi allows Property Managers to track rent due dates, rent payments, delinquencies, late fees, court fees, and outstanding rent balances. (Pl. Resp. 8.) All MPMC properties are connected to Yardi and all operate on the same timeline, allowing for automatic notices to be filed in the system for each tenant. (Def. Mem. 15-16.) Yardi also allows Property Managers to make notes for individual tenants by way of a "delinquency memo" option in the software, where

a Property Manager can record any information pertinent to that tenant's rental payments. (Pl. Resp. at 8.)

It is standard practice for Property Managers at MPMC to document communications and rental arrangements made with tenants in Yardi's delinquency memo field. (Pl. Resp. Ex. 1, Beechan Tr. 76:9-77:12.) Property Managers routinely run "delinquency reports" informing the Property Manager which tenants are late on their rent, and when they run these delinquency reports, the report "pulls" whatever delinquency memos have been filed in Yardi regarding those individually delinquent tenants. (Pl. Resp. Ex. 9, McPherson Tr. 27:12-30:8; Ex. 8, Borkowski Tr. 45:3-11.) Based on these delinquency reports, the Property Manager or their assistants will begin to conduct tenant outreach – a process that can be "lengthy" and involves calling, emailing, and seeing the tenants in person – in order to try and collect the delinquent rent. (Pl. Resp. Ex. 8, Borkowski Tr. 37:18-38:19; Ex. 6, SSOP.)

MPMC's SSOP for delinquency instructs Property Managers to file a complaint in court against any tenant who has a delinquent balance on the 15th of the month. (*Id.*) Delinquent tenants who have court complaints brought against them are charged a court filing fee by MPMC. (Pl. Resp. Ex. 6, SSOP; Ex. 9, McPherson Tr. 37:3-15.) Property Managers first must drop off the complaint with the court, a process that takes "a few minutes plus travel time" to the court and back. (Pl. Resp. Ex. 9, McPherson Tr. 47:25-48:5.) In the event the tenant continues to be delinquent, the Property Manager must attend the hearing and have each delinquent tenant's case adjudicated individually by the judge. (*Id.* at 37:24-38:4, 48:6-16.) Throughout this process of delinquent rent collection, Property Managers are instructed by MPMC to "update the Delinquency comments in Yardi on an ongoing basis . . . ." (Pl. Resp. Ex. 6, SSOP; *see also* Ex. 24, Zimmerman Email to Managers.) Overall, court filings for delinquent rent are made on

less than 5% of MPMC tenants each month, and less than 1% are evicted. (Pl. Resp. 11.) At the

Philadelphia-area MPMC properties, Defendants calculate that Property Managers spent

anywhere from 4% to 9% of their overall work hours dealing with these court related issues,

including filling out the complaint, driving to and from the courthouse, and time spent at the

hearings. (Def. Mem. 16.)

As discussed, MPMC's policy is to have Property Managers file in court against

delinquent tenants no later than the 15th. (Pl. Resp. Ex. 6, SSOP.) However, in practice,

Property Managers have discretion to make exceptions to this rule, and MPMC has stipulated

that it does allow temporary adjustments made on an individual basis for certain tenants. (Joint

Stip. ¶ 6.) Because late fees are automatically imposed by the Yardi system if rent is not paid by

the 6th, Property Managers must reverse any late fees by going into the Yardi software and doing

so manually. (Pl. Resp. 11.) This manual reversal, which may involve the manager

documenting the reason for the reversal in the delinquency memo field, takes a few minutes for

the manager to complete. (Pl. Resp. Ex. 9, McPherson Tr. 56:21-57:11.) The evidence in the

record suggests this is a common practice; between 2011 and 2013, MPMC "reversed" 2,130 late

fees at the three Philadelphia-area properties listed in the Amended Complaint. (Pl. Resp. Ex.

29, Def. Answers to Pl.'s 4th Interrogatories ¶ 15.)

Similarly, Property Managers have discretion to not file court complaints against

delinquent tenants, or to delay filing until after the 15th of the month. (Pl. Resp. 12.) This is

also a relatively common practice at MPMC. Between 2011 and 2013, MPMC filed in court

1,228 times for tenants living at the three Philadelphia-area properties mentioned above, and of

those filings, 481 were filed after the 15th of the month, and 12.7% were filed after the 20th of

the month. (Pl. Resp. 12, citing Ex. 32, MPMC Charge Register.)

With regard to what the rents actually are at these properties, Defendants have provided the lowest, average, and highest monthly rental fees for each of the three Philadelphia-area properties named in the Amended Complaint. At Kingswood, those respective rents are $845, $1,259, and $4,080; at Brookside Manor, $830, $1,327, and $2,543; and at Montgomery Woods, $950, $1,224, and $1,789. (Pl. Resp. Ex. 44, Schechter Ans. to Written Questions ¶ 11.)

Plaintiff has submitted evidence indicating that, contrary to MPMC's stipulation that it does not allow permanent or indefinite alterations to the rental due date, a number of tenants at MPMC properties have in fact been allowed to pay rent after the 5th of the month on a permanent or indefinitely ongoing basis.[3]

Leonard Getzoff, a tenant at the Towers of Windsor Park, an MPMC property in New Jersey, had a written "Rent Extension Agreement" with the Property Manager there under which Getzoff's rent would be due by the 20th of each month without the imposition of any late fees. (Pl. Resp. Ex. 34, Getzoff Agreement.) This agreement appears to have been ongoing from at least December 2010 through 2012, and then continued on through 2017 with the due date changing to the 15th. (*Id.*) The delinquency memos in the Yardi system for Getzoff's file note this arrangement, and they explain that he was allowed this extension because of his dependence on social security income and the timing of his social security checks. (*Id.*)

Juan Carrasquilla and Kelly Bolden, two tenants at Brookmont Apartments, an MPMC property in Philadelphia, had longstanding arrangements with an altered rent payment schedule. Carrasquilla had some form of rent arrangement that allowed him to pay a portion of his rent on the 15th of each month and the rest on the 31st. (Pl. Resp. Ex. 33, Carrasquilla Arrangement.) It

___

[3] Defendants have moved to exclude evidence related to MPMC properties other than the three Philadelphia-area properties named in the Amended Complaint. (Def. Mot. in Limine and Mem., ECF Nos. 52, 53.) This Court has denied that motion and found that this evidence is relevant and admissible. (ECF Nos. 65, 66.)

is not clear how long this went on, but it appears to have been a recurring (although not continuous) arrangement lasting from at least December 2015 to March of 2017.  (*Id.*)  Bolden appears to have had an agreement with multiple Property Managers at Brookmont Apartments that allowed her to pay rent on the 15th of each month.  (Pl. Resp. Ex. 35, Bolden Agreement.)

Michele Casciano, a tenant at Abrams Run Apartments, an MPMC property in King of Prussia, had an arrangement that lasted from at least February 2015 to January 2016, under which she would pay her rent in full by the 20th, in addition to a late fee.  (Pl. Resp. Ex. 36, Casciano Arrangement.)  This arrangement was approved by at least two different Property Managers, and was signed off on by an MPMC regional manager, as well.  (*Id.*)

In addition to these individual tenants' rental due date arrangements, MPMC allows any of its employees who live at its properties to pay their rent via twenty-four deductions over the course of the year from their bi-weekly paychecks.  (Pl. Resp. Ex. 1, Beechan Tr. 36:20-37:13.)  As a result of this withdrawal method, these employee-tenants do not always pay rent on the 1st of every month, which causes them to be flagged as delinquent in Yardi's delinquency memos.  (*Id.* at 41:4-19, 44:4-13.)  As part of their normal job duties, the Property Managers then have to review those employee-tenants' delinquency memos to determine if the Yardi system is flagging them as delinquent because of the employee-rent withdrawal system (in which case the manager would enter that note into the delinquency memo field), or for some other fee actually owed by the employee, such as parking or utility fees.  (*Id.* at 42:8-44:3, 47:20-48:1.)

Plaintiff has also submitted evidence of multiple MPMC tenants who have sought to alter their rent due date because of the timing of their SSDI benefits.

Karen Simmons, a tenant at The Preserve at Owings Crossing in Maryland, requested that her rent due date be changed and late fees waived because she receives SSDI benefits on the

third Wednesday of the month. (Pl. Resp. Ex 16, Simmons Denial Letter.) Her request was denied by the Property Manager of that property, who informed Simmons that it was MPMC's position that the request would be an accommodation for a financial need rather than a disability-related need. (*Id.*) Similar requests were made and denied for tenants Mr. and Mrs. Danny Hanratty at Chesapeake Glen Apartments (Pl. Resp. Ex. 17, Hanratty Denial Letter), Eddie Rivera at Summit Pointe (Pl. Resp. Ex. 18, Eddie Rivera Reasonable Accommodation Log), and Estelle Leach at Grant Point (Pl. Resp. Ex. 19, Leach Denial Letter).

*iii.*     *Social Security Disability Income Data*

Plaintiff has submitted an expert report concerning general information regarding the SSDI program and how it affects SSDI recipients. SSDI benefits are provided to disabled people who, because of their disability (*i.e.*, a physical or mental impairment that has lasted or is expected to last for 12 months or result in death), are unable to perform substantial gainful activity. (Pl. Resp. Ex. 20, Weishaupt Expert Rep.) Substantial gainful activity is defined as earning more than $1,170 per month. (*Id.*) The majority of SSDI recipients are disabled workers, although disabled widows and widowers aged 50-59, disabled divorced spouses, and disabled adult children may also receive SSDI benefits. (*Id.*)

SSDI recipients receive their benefits once a month. (*Id.*) However, not all SSDI recipients are paid on the same day. The federal government uses a staggered payment system where recipients are paid throughout the month according to their date of birth. (*Id.*) SSDI recipients with a birthdate falling on the 1st through the 10th of the month receive their benefit on the second Wednesday of the month; those born on the 11th through the 20th receive benefits on the third Wednesday; and those born on the 21st through 31st receive their benefits on the fourth Wednesday. (*Id.*) Most recipients receive these payments electronically, so the funds are

9

available to beneficiaries almost immediately upon receiving their benefit. (*Id.*) Recipients are not able to request any changes or variations to this payment schedule. (*Id.*)

SSDI benefit amounts vary from recipient to recipient based on their prior earnings. (*Id.*) The average SSDI benefit is $1,171, but some individuals receive up to $2,687. (Pl. Resp. Ex. 39, Weishaupt Rebuttal.) Because they are disabled and by definition unable to earn a living through work, the vast majority of SSDI recipients, reportedly more than 80%, rely on these SSDI benefits as their main source of income. (Pl. Resp. Ex. 20, Weishaupt Rep.) For one third of SSDI recipients, the SSDI benefits are their only income. (*Id.*) Plaintiff's Expert, Richard Weishaupt, makes the point explicitly: "In short, SSDI provides benefits only to those who cannot work." (*Id.* at 10.)

### B. Procedural Background

On September 1, 2016, Plaintiff filed an Amended Complaint alleging that Defendants have engaged in discriminatory actions and refused to make reasonable housing accommodations to persons with disabilities. (ECF No. 2.) On December 29, 2016, Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 22.) On January 17, 2017, Plaintiff filed a Response to Defendants' Motion. (ECF No. 27.) On April 11, 2017, a Memorandum and Order were entered disposing of Defendants' Motion. (Mem. & Order, ECF Nos. 35, 36.) On November 22, 2017, Defendants filed the instant Motion for Summary Judgment. (Def. Mot., ECF No. 53; Def. Mem. ECF No. 54.) Plaintiff filed a Response in Opposition on December 22, 2017. (Pl. Resp. ECF No. 59.) Defendants filed a Reply on January 12, 2018. (Def. Reply, ECF No. 60.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id*. The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone,* 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc*., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.    DISCUSSION

### A.  Failure to Accommodate

The FHAA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."  42 U.S.C. § 3604(f)(2). "[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

"To determine whether an accommodation is 'reasonable,' we consider 'whether the requested accommodation is (1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.'"  *Revock v. Cowpet Bay W. Condo. Ass'n.*, 853 F.3d 96, 110 (3d Cir. 2017) (quoting *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains*, 284 F.3d 442, 457 (3d Cir. 2002)).  The "plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling." *Lapid-Laurel*, 284 F.3d at 457.  If the plaintiff carries that initial burden, "the burden then shifts to the defendant to show that the requested accommodation is unreasonable." *Id.*  Therefore, in order to evaluate a motion for summary judgment on a reasonable accommodations claim, a court must "determine whether there is a genuine issue of material fact regarding:  (1) whether the accommodations that [the plaintiff] requested were necessary to afford handicapped persons an equal opportunity to use and enjoy housing; and, if so (2) whether the accommodations requested were unreasonable." *Id.* at 459.

i.      *Necessity of Plaintiff's Requested Accommodations to Afford SSDI Recipients an Equal Opportunity to Use and Enjoy Housing*

"[T]he plaintiff in an FHA[] reasonable accommodations case must establish a nexus between the accommodations that he or she is requesting, and their necessity for providing handicapped individuals an 'equal opportunity' to use and enjoy housing." *Id.* This may be accomplished by showing that, "but for the accommodation, [the plaintiff] will likely be denied an equal opportunity to enjoy the housing of their choice." *Id.* at 460 (internal quotation omitted).

Defendants argue that Plaintiff's requested accommodation is not necessary because it is meant to accommodate SSDI recipients' financial hardship rather than their actual disabilities. Therefore, it is not required by the FHA.[4] Plaintiff responds that courts have held that financial circumstances resulting from a disability are relevant to the determination of what is a necessary accommodation.

In our ruling on Defendants' Motion for Judgment on the Pleadings, we held that "the FHA does permit consideration of a disabled person's financial circumstances in determining whether [a] reasonable accommodation is required." (Mem. at 11.) Defendants' present argument is lifted nearly verbatim from its prior unsuccessful motion on this exact point. We again find Defendants' argument unavailing and reiterate our prior holding.

---

[4] Defendants also argue that FHRC's testers failed to engage in an "interactive process" and so were never actually refused a reasonable accommodation. That argument is irrelevant. First, the Third Circuit has already "decline[ed] to extend the 'interactive process' requirement that exists in the employer-employee context of the Rehabilitation Act to the housing and land use context of the FHAA … [as that] process was never intended to apply in this context." *Lapid-Laurel*, 284 F.3d at 446. Second, FHRC is challenging Defendants' stipulated policy of not allowing any permanent or indefinite alterations to the rental due date at its properties. Whether the testers engaged in an interactive process has no bearing on this lawsuit. Defendants fully admit that they will not alter the rental due date as an accommodation for SSDI recipients.

In *Giebeler v. M & B Associates*, 343 F.3d 1143, 1155 (9th Cir. 2003), the plaintiff became disabled and unable to work after contracting the AIDS virus, and he began to receive SSDI benefits and Housing Opportunities for People with Aids benefits. *Id*. at 1145. The plaintiff applied to rent an apartment, but was told that although his monthly income exceeded the rental amount, prospective tenants were required to have an income of three times the monthly rent in order to qualify. *Id*. Although his pre-disability income would have satisfied that requirement, his disability benefits income could not. *Id*. The plaintiff offered to have his mother co-sign the lease and thus satisfy the income-to-rent requirement, but the defendant had a policy against permitting co-signers on lease agreements and rejected the plaintiff's application. *Id*. The plaintiff requested that the co-signor policy be waived as a reasonable accommodation under the FHAA because he was disabled and unable to support himself. *Id*. The defendant cited its policy and denied the accommodation. *Id*. The defendants argued that permitting such an accommodation for the plaintiff would: (1) show preferential treatment to disabled persons, (2) accommodate the plaintiff's poverty and financial situation, and (3) create unreasonable financial exposure for the defendant. *Id*.

The Ninth Circuit rejected these arguments as "run[ing] afoul of binding case law elucidating the 'accommodation' concept in the FHAA . . . ." *Id*. at 1148. The court held that the co-signor waiver accommodation was required because an "[i]mposition of burdensome policies, *including financial policies*, can interfere with disabled persons' right to use and enjoyment of their dwellings . . . ." *Id*. at 1155 (emphasis added). The court found the causal nexus between the apartment building's policy and the plaintiff's disability to be "obvious:" the plaintiff "was unemployed because of his disability and therefore had insufficient income to qualify for the apartment"; the plaintiff could qualify for the apartment if his mother was allowed

to co-sign, but the building refused to allow a co-signor or any other similar manner of accommodation to prove the plaintiff's financial responsibility; so, his disability necessarily led to his being prevented from renting the apartment "for which he would otherwise be qualified." *Id.* at 1155-56. The *Giebeler* court joined other circuits in recognizing that "exceptions to neutral policies may be mandated by the FHAA where disabled persons' disability-linked needs for alterations to the policies are essentially financial in nature." *Id*. at 1152 n.6 (citing *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795-96 (6th Cir. 1996) (holding that, where group homes were necessary to prevent the exclusion of disabled persons from residential neighborhoods but were not economically feasible without nine residents, City had to reasonably accommodate by altering the six-person occupancy limit specified by law for residentially-zoned areas); *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 787 (7th Cir. 2002) (holding that variance was a necessary accommodation for a group home for the disabled plaintiffs in part because their financial circumstances were such that they could not afford individual homes). The court also rejected the "preferential treatment" argument, noting that the Supreme Court has explicitly held that a reasonable accommodation may result in a preference for disabled individuals over otherwise similarly situated nondisabled individuals. *Id.* at 1150 (citing *U.S. Airways v. Barnett*, 535, U.S. 391 (2002) ("By definition, any special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially").

Having found that the financial circumstances of disabled tenants and prospective tenants may be considered in determining the necessity of FHRC's requested accommodation, we turn to the facts of the instant case.

FHRC has presented substantial evidence to support its argument that but for the Defendants' refusal to make the accommodation of altering the rental due date, SSDI recipients will likely be denied an equal opportunity to rent apartments at Defendants' properties. By definition, SSDI recipients cannot work. The vast majority of them rely on their SSDI benefits as their primary income. As FHRC's expert pointed out, many SSDI recipients live benefit check-to-benefit check, exhausting their benefits every month on standard living expenses in addition to health care and other costs associated with having a disability, making it nearly impossible to accrue any savings. (Pl. Resp. Ex. 20, Weishaupt Rep. 6-7.) Moreover, SSDI recipients have no control over when they receive the money on which they are dependent, since the federal government has a set disbursal schedule that cannot be changed. So, while many SSDI recipients will receive enough in SSDI benefits to afford the rent at various MPMC properties – the average SSDI benefit is $1,171, and the minimum rents at Defendants' three Philadelphia-area properties are $830, $845, and $950 – these recipients may nevertheless be prevented from paying the rent within the first few days of the month, as they may not receive their benefit check until later in the month. The nexus between their disability and their inability to rent an apartment at Defendants' property because of the rental due date policy is clear.

Like the plaintiff in *Giebeler*, these potential SSDI recipient tenants are not requesting a lower rent. FHRC has shown that there are SSDI recipients who can afford to live at these apartments. FHRC is instead asking that, like waiving the prohibition on co-signors in *Giebeler* for a tenant who could otherwise afford the apartment, Defendants consider relaxing their rental due date policy and undertake a fact-specific, case-by-case review for those SSDI recipients who would otherwise be eligible to rent their apartments. Defendants argue that many SSDI recipients would still fail to qualify for their apartments because of Defendants' three-to-one

income-to-rent ratio. However, some SSDI recipients would still qualify (some receive up to $2,687 a month in benefits), and that argument is clearly not relevant for any current SSDI recipient-tenants at Defendants' properties.

Accordingly, we find that a genuine dispute of material fact exists regarding whether the rental due date accommodation that FHRC has requested is necessary to afford handicapped persons an equal opportunity to use and enjoy housing.

ii.     *Reasonableness of the Requested Accommodation*

The Defendants bear the burden of showing that FHRC's requested accommodation is unreasonable. *Lapid-Laurel*, 284 F.3d at 457-59. In order to establish that the accommodation is not reasonable, Defendants must prove they could not grant the accommodation without (1) imposing undue financial and administrative burdens, (2) imposing an undue hardship upon the Defendants, or (3) requiring a fundamental alteration in the nature of Defendants' business. *Id.* at 462 (citing *Hovsons, Inc. v Township of Brick*, 89 F.3d, 1104 (3d Cir. 1996)).

However, because "[t]he determination of whether an accommodation is reasonable is a question of fact to be decided by a jury," the "only issue [here] is whether Plaintiff presented sufficient evidence to raise a triable issue of fact." *Solivan v. Valley Hous. Dev. Corp.*, No. 08-2722, 2209 WL 3763920, at *6 (E.D. Pa. Nov. 9, 2009) (citing *Buskirk v. Apollo Metals*, 307 .3d 160, 170 (3d Cir. 2002)).

We are satisfied that Plaintiff has presented sufficient evidence to create a genuine dispute as to whether its requested accommodation is reasonable. The reasonableness inquiry is "highly fact-specific, requiring a case-by-case determination." *Lapid-Laurel*, 284 F.3d at 462 (citations omitted). While Defendants argue that FHRC's requested accommodation would cause them to suffer an undue financial hardship and make fundamental changes to their business

practices, FHRC argues that the evidence in this record shows that Defendants are already making essentially the same accommodation for numerous other tenants and that Defendants' business practices and financial bottom-line would be relatively unchanged if they made this accommodation for SSDI recipients.

With regard to the individual tenants who have already negotiated permanent or indefinitely altered due dates with their respective Property Managers, Defendants contend that these were unauthorized arrangements or took place at properties other than those named in the Amended Complaint and so are irrelevant. However, they do not contest their existence. In addition, Defendants also allow their employees to pay their rent at times other than the first of the month. Defendants therefore are already allowing an untold number of tenants to be considered "late" in the Yardi rent collection and tracking system, which causes the system to flag them as delinquent, which a property manager must then manually override.

Although Defendants argue that allowing SSDI recipients to have an altered due date would result in increased administrative burdens because of the need for manual reversals of late fees, there is clear evidence that they are already allowing many tenants to have their late fees manually reversed without penalty, both as a matter of negotiated arrangements with their tenants and employee-tenants, and on an *ad hoc* discretionary basis for any number of random tenants who incur a late fee. Furthermore, manual reversals in general do not seem to create much of a burden, or at least are a regular course of business, as they happen hundreds of time a year at each property. Defendants do not cite any evidence documenting how much money or time they already spend or lose allowing this practice to continue. Christine Beechan testified that MPMC does not track how many temporary rent adjustments it makes at any given property in a given month, nor does it calculate the costs of those adjustments. (Def. Mot. Ex. 8, Beechan

Tr. 25:4-22.) It is therefore difficult to accept Defendants' arguments that allowing SSDI recipients to have similar accommodations would be unduly burdensome. Defendants have not done the work to determine what it might realistically cost them.

Defendants similarly argue that the Yardi system they use would have to be changed at an "untold cost." (Def. Mem. at 16.) The evidence in this record at the very least creates a genuine dispute as to whether that is so. It appears that the Yardi system is quite capable of allowing property managers to easily track and manage exactly when tenants are paying and when they are not. Defendants' property managers Borkowski and McPherson both testified that it is their job to routinely use the Yardi system's delinquency memo function to monitor individual tenants' rental status and to record information on individual tenants' rental arrangements. Defendants contend that this aspect of their job would become burdensome if they were forced to make the requested accommodation. However, it appears that Property Managers are already performing this task regularly, and Defendants cite no evidence to suggest that accommodating SSDI recipient-tenants would significantly increase this aspect of the Property Managers' job.

Defendants also argue that the Property Managers would be deluged with court filings and would be overburdened by having to travel to the court house many different times during the month. However, Borkowski and McPherson both testified that time spent filing charges against tenants in court is a small fraction of their workload, and Defendants offer little evidence to suggest that this would actually change if SSDI recipients were allowed to pay rent at other times of the month.

Defendants make the case that their properties must pay their mortgages and other bills, which are usually due on the first of the month and require a certain amount of cash on hand and

which must be planned for according to the rental income.  They make a compelling point arguing that if enough tenants paid after the first of the month, it could conceivably cause problems in this regard.  However, they submitted no evidence to allow this Court to weigh the significance of those concerns, *e.g.*, no hard numbers as to the mortgage payment, how much cash they keep on hand to pay the mortgage, or how many renters with a hypothetically later rental due date it would take to affect these cash reserves.

Finally, many of Defendants' arguments regarding the undue hardship they would suffer are policy-type arguments that have no bearing on the reasonableness of an accommodation in the housing context.  Those arguments are not only irrelevant, but they also ignore the "reasonableness" constraint of the FHA.  Defendants' hypothetical of allowing SSDI recipients to go grocery shopping with I.O.U.'s does not negate the fact that there is a genuine material dispute here as to whether a flexible rental due date accommodation is unreasonable.

Accordingly, we find that Defendants have failed to demonstrate the absence of a genuine dispute of material fact as to whether the rental due date accommodation that FHRC has requested is unreasonable.  Therefore, Defendants' Motion for Summary Judgment on the reasonable accommodations claim will be denied.

### B.    Disparate Impact[5]

Section 3604(f)(1) of the FHAA provides that it is unlawful:

> To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
> > (A) that buyer or renter,

---

[5] FHRC's Amended Complaint also brought a claim against Defendants for disparate treatment.  Although there appears to be some confusion among the parties as to that claim, we have already ruled that FHRC failed to state a claim for disparate treatment, and that claim has been dismissed.  (*See* Mem. 8-9 n. 3) ("[W]e find Plaintiff's argument unconvincing and insufficient to state a claim of disparate treatment against Defendants.").

(B) a person residing in or intending to reside in that dwelling after it is so
sold, rented, or made available; or
(C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1).  Congress has expanded upon the "otherwise make unavailable"

requirement, "recogniz[ing] that 'another method of making housing unavailable to people with

disabilities has been the application or enforcement of otherwise neutral rules and regulations . . .

which discriminates against people with disabilities.'"  *United States v. California Mobile Home

Park Mgmt. Co.*, 29 F.3d 1413, 1417 (9th Cir. 1994) (quoting H.R. REP. No. 100-711, at 24

(1988)).

When evaluating FHAA discrimination claims, the court must apply the familiar

*McDonnell Douglas* burden shifting paradigm.  *See Langley v. Toll Bros., Inc.*, No. 15-4720,

2016 WL 4011333, at *5 (E.D. Pa. July 26, 2016) (collecting Third Circuit cases affirming this

approach).

The plaintiff must first make out a prima facie case of disparate impact by showing that

the defendant's action "disproportionately burdened a particular [protected] group so as to cause

a disparate impact."  *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d

375, 382-83 (3d Cir. 2011) (citation omitted) (noting also that disparate impact claims do *not*

require proof of discriminatory intent); *see also Texas Dep't. of Hous. and Comm. Affairs v.

Inclusive Comms. Proj., Inc.*, 135 S.Ct. 2507, 2525-26 (2015) (holding that disparate impact

claims are cognizable under the FHA).  There is "no single test" which controls in measuring

disparate impact.  *Id.*  Although statistics are most often used to demonstrate the disproportionate

burden, a plaintiff must simply offer proof of that impact in a plausibly measured way.  *Id.*

If a disproportionate burden is established, the burden shifts to the defendant to establish

whether it has a legitimate, non-discriminatory reason for its actions.  *Id.*  If the defendant can

establish that reason, it must then also establish that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact. *Id.* This test is quite "'similar to the test of whether the defendant has demonstrated that the requested accommodation is 'unreasonable' for the purposes of rebutting a claim under § 3604(f)(3)(B).'" *Id.* (quoting *Lapid-Laurel*, 284 F.3d at 468). "'In other words, the defendant must show that the alternatives impose an undue hardship under the circumstances of this specific case.'" *Id.* (quoting *Barnett*, 535 U.S. at 401-02)

Finally, if the defendant makes this showing, the burden shifts back to the plaintiff, who must demonstrate that there is a less discriminatory way to advance the defendant's legitimate interest. *Id.*

Here, we find that there is a genuine dispute of material fact regarding Defendants' proffered legitimate non-discriminatory reason for its policy and the supposed lack of alternatives. Initially, FHRC has established a prima facie case of disparate impact. It argues that Defendants' facially neutral policy disproportionately burdens SSDI recipients. It supports that argument with its expert's report noting that many if not most SSDI recipients live benefit check to benefit check while being tied to the government's disbursal schedule, and so are unable to rent apartments from Defendants which they would otherwise be able to afford. FHRC argues that nearly all SSDI recipients, or close to one-hundred percent, are negatively impacted by this policy. It seems clear that this policy does not impact non-disabled but otherwise similarly situated tenants at any rate even close to one-hundred percent. Therefore, FHRC has established a prima facie case of disparate impact.

Turning to Defendants' proffered legitimate reason for the policy, they argue that they have imposed their challenged rental policy because their business model is set up to receive rent

in the beginning of the month, all of their systems are coordinated to collect rent on the first of the month, and making their properties' mortgage payments and utility bills requires a certain amount of cash reserves which would be upset by variable rental due dates. These are legitimate, non-discriminatory reasons for their stated policy.

However, we find that much like the undue hardship analysis for the reasonable accommodation claim above, Defendants have failed to show that any alternatives to their inflexible policy would impose an undue hardship under the circumstances of this specific case. FHRC's proposed alternative is to institute a flexible, fact-specific, individualized assessment for each SSDI recipient who requests a changed due date based on their benefits schedule. Defendants argue that this proposed alternative would fundamentally alter their business and create undue financial and administrative hardship. Defendants offer little substantive evidence to support their argument. They offer no real calculation of the cost of changing this policy, and as discussed above, their "fundamentally altered business practices" arguments are contradicted by the evidence submitted by FHRC that Defendants already make similar accommodations for many of their tenants.

Accordingly, we find that at the very least there are genuine issues of material fact concerning Defendants' rental due date policy and their arguments for why there are no less-discriminatory alternatives. Defendants have failed to meet their burden for summary judgment on the disparate impact claim, and their motion for summary judgment will be denied. *See Mt. Holly*, 658 F.3d at 381-87 (denying summary judgment because of a genuine dispute over feasibility of proposed alternative to defendant's policy).

**IV.     CONCLUSION**

For the foregoing reasons, Defendants Motion for Summary Judgment will be Denied.

An appropriate Order follows.

**BY THE COURT:**

_____
**R. BARCLAY SURRICK, J.**